UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.                                          Case No. 20-CR-185

MIGUEL SARABIA,

Defendant.

## PLEA AGREEMENT

1.      The United States of America, by its attorneys, Richard G. Frohling,
United States Attorney for the Eastern District of Wisconsin, and Elizabeth M.
Monfils and Gail J. Hoffman, Assistant United States Attorneys, and the defendant,
Miguel Sarabia, individually and by attorney Matthew J. Lombard, pursuant to
Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea
agreement:

### CHARGES

2.      The defendant has been charged in an Information, which alleges a
violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B); and Title
18, United States Code, Section 2(a).  The defendant has also been charged in four
courts of a fifteen-count Indictment, which alleges violations of Title 21, United
States Code, Sections 841(a)(1), (b)(1)(A), (b)(1)(B), (b)(1)(C), and 846; and Title 18,
United States Code, Sections 1956(a)(1)(B)(i), 1956(h) and 2.

3.      The defendant has read and fully understands the charges contained

in the Information and Indictment. He fully understands the nature and elements

of the crimes with which he has been charged, and those charges and the terms and

conditions of the plea agreement have been fully explained to him by his attorney.

4.      The defendant voluntarily agrees to waive prosecution by indictment

in open court.

5.      The defendant voluntarily agrees to plead guilty to the following count

set forth in full as follows:

### INFORMATION

**THE UNITED STATES ATTORNEY CHARGES THAT:**

1. Beginning by at least September 2019, and continuing until on or
about September 22, 2020, in the State and Eastern District of Wisconsin and
elsewhere,

**MIGUEL SARABIA**

knowingly and intentionally conspired with each other, and with other
persons known and unknown to the grand jury, to possess with the intent to
distribute and to distribute a mixture and substance containing a detectable
amount of a controlled substance, in violation of Title 21, United States Code,
Section 841(a)(1).

2. With respect to the defendant, the amount involved in the
conspiracy attributable to the defendant as a result of his own conduct, and
the conduct of other co-conspirators reasonably foreseeable to him, is 100
kilograms or more of a mixture and substance containing a detectable
amount of marijuana, a Schedule I controlled substance.

All in violation of Title 21, United States Code, Section 841(b)(1)(B) and
Title 18, United States Code, Section 2(a).

6.      The defendant acknowledges, understands, and agrees that he is, in

fact, guilty of the offense described in paragraph 5. The parties acknowledge and

understand that if this case were to proceed to trial, the government would be able

2

to prove the following facts beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt:

## Summary of Investigation

In September 2018, law enforcement authorities identified Louis R. Perez III (a/k/a "Ocho," and a/k/a "Eight Ball"), also identified as a Mexican Posse gang member, as the individual spearheading a drug-trafficking organization (DTO) that was distributing large quantities of cocaine and marijuana throughout Milwaukee, Wisconsin, and elsewhere since at least January 2017. Law enforcement authorities also identified Xina Yang, Perez III's then girlfriend, as someone who worked hand-in-hand with Perez III to further the DTO. The DTO obtained cocaine and marijuana from California, either through couriers or through United Parcel Service (UPS) and FedEx. Perez III and Yang coordinated the package retrieval from various Milwaukee, Wisconsin, residences, oversaw a marijuana vape cartridge manufacturing operation located at a codefendant's residence, distributed marijuana and marijuana-related products under the name brand "Midwest Connect" or "Midwest Connected," and mailed drug proceeds to the California-based supplier.

Upon further investigation, authorities learned that, beginning in at least January of 2017, Julian Sanchez and/or Miguel Sarabia, Sanchez's father, who resided in California, supplied the Perez III DTO with bulk marijuana, marijuana edibles, marijuana oils/waxes, and marijuana vape cartridges.

During the course of the investigation, Title III orders authorized the interception of communications over seven telephones used by Perez III, Yang, Sanchez, and Sarabia, as well as the Snapchat account "Midwest_connect," used by Perez III. Collectively, these interceptions began on March 20, 2020, and continued through September 22, 2020, with the exception of small periods of time. The intercepted communications confirmed that Perez III obtained marijuana from Sanchez and Sarabia; that Perez III distributed the narcotics to mid-level distributors and suspected street-level users; and that Yang facilitated and coordinated the day-to-day DTO operations.

## DTO's History, Method, and Operation

The investigation revealed that up until late 2019, Perez III and Yang frequently traveled to California on behalf of the DTO, many times staying for significant periods of time in hotels and Airbnb rentals. At this time, Perez III and Yang instructed other DTO members to manage the distribution of controlled substances in Milwaukee when they were in California.

3

On September 25, 2018, Louis R. Perez Jr., Perez III's father, was stopped in Utah with eight kilograms of cocaine in a trap compartment in his truck. Perez III and Yang drove separately, but traveled along with Perez Jr. from California to Wisconsin, communicating with Perez Jr. on two prepaid telephones activated before their departure from California. After Perez Jr. was stopped, Perez III and Yang also stopped, at which point Yang booked hotel rooms and airfare for herself, Perez III, and Perez Jr. upon his release from custody.

Beginning in November 2019, Perez III and Yang moved back to Milwaukee. At this time, the DTO's mode of operation switched to mailing controlled substances and proceeds between California and Milwaukee. Also at this time, Sanchez obtained hundreds of pounds of marijuana from growers in northern California. Sanchez, along with Gabriel Matteson, packaged and sent the marijuana through FedEx and UPS to numerous addresses in Milwaukee, Wisconsin. Perez III and Yang regularly tracked the controlled substance packages' whereabouts. They also coordinated the package retrieval from various Milwaukee residences.

Court authorized interceptions, combined with physical surveillance, reflect that the Perez III DTO received at least 200 packages, believed to contain marijuana and THC oil, which have been delivered by FedEx and UPS, to at least eight different addresses. DTO package recipients included Jose Alvarado, Shayla Knueppel, Mercedes Herbert Gonzalez, Chong Yang, Mary Yang, Ma Yang, and Michael Bub.

On April 29, 2020, law enforcement seized and lawfully searched a DTO package. The package contained approximately 9 pounds of high-grade marijuana and approximately 237 grams of THC oil, which oil was packaged in one-gram quantity plastic containers. Both the THC oil and marijuana were packaged in vacuum sealed bags. Later in the day on April 29, 2020, in accordance with UPS policy, UPS opened another package addressed to Alvarado and Knueppel's address because it smelled of marijuana. The package was found to contain approximately 2,029 grams of THC oil, which was packaged in one-gram quantity plastic containers. Throughout April 29 and 30, 2020, both Perez III and Yang contacted FedEx and UPS numerous times regarding the intercepted packages.

Perez III used couriers, including Manuel Soto, Antonio Rodriguez, Hauseng Yang, and Esteban Reyes, to obtain the packages containing controlled substances from various addresses and transport the packages to other DTO locations, including Perez Jr.'s residence, where the packages were stored until manufacture, packaging, and distribution. Hector Arenas maintained at least two stash houses where Perez III and various other DTO members were often seen coming and going around the time of suspected drug transactions. Jasmine Perez, Perez III's sister, served as a DTO nominee, leasing one of the stash apartments that was controlled by Manual Soto.

Additionally, the Perez III DTO manufactured "vape cartridges" containing THC oil at the residence of Mary Yang, Yang's sister. Under the direction of Perez III and Yang, marijuana vape cartridges were assembled by the thousands by DTO members primarily connected to Xina Yang, including Ma Yang, Mary Yang, Chong Yang, Azia Yang, Carina Rodriguez, Ger Yang, Hauseng Yang, and Michael Bub. The investigation also revealed that Sanchez and/or Sarabia also imported supplies, to include vape cartridge tubes and boxes, as confirmed by the seizure and search of five DHL packages, which contained high-end, top rated CUREpen and Rove vape cartridge boxes.

Case agents estimate based on the number of DHL boxes received by the Perez III DTO that the DTO received at least 25,000 vape cartridge boxes and empty marijuana vape pens that were imported from Hong Kong.

Perez III distributed the cocaine, marijuana, and marijuana-related products to mid-level DTO-distributors, including Manuel Soto, Antonio Rodriguez, Hauseng Yang, Hector Arenas, Luis Gomez, Jr., Ivan Galan, Esteban Reyes, Kevin Taylor, and Ger Yang. These mid-level distributors subsequently distributed the controlled substances to numerous customers in the greater Milwaukee, Wisconsin, area, at times using the third-party application Snapchat. The marijuana and marijuana-related products were distributed under the brand name "Midwest Connect" or "Midwest Connected."

Subsequently, the DTO mailed packages containing bulk currency in the form of drug proceeds to Sanchez or enlisted money couriers to transport the drug proceeds to California. Furthermore, on various occasions in 2020, Sarabia traveled to Milwaukee, Wisconsin, to obtain drug proceeds from Perez III.

Yang counted and packaged the drug proceeds that were sent to Sanchez via the United States Postal Service (USPS) at three different addresses. Ma Yang, Yang's sister, often assisted. On April 16, 2020, law enforcement searched two parcels that Perez III mailed to Sanchez, pursuant to sneak and peak warrants. The search revealed that each parcel contained $20,000 in U.S. currency hidden in magazines. The money was meticulously taped between the various magazine pages to conceal the parcels' true contents.

Although Perez III and/or Yang used aliases and unrelated addresses to ship the packages, post office video surveillance, court-ordered location data from tracking devices on their vehicles and telephones, and court-authorized intercepted communications confirmed their association with the packages.

Since at least December 11, 2019, Perez III and Yang mailed at least 87 packages, believed to contain bulk U.S. currency, to Sanchez in California, using the United States Postal Service (USPS). Based upon DTO records, the DTO mailed approximately $1.7 million in drug proceeds in a six-month period. In July 2020,

5

Perez III mailed three USPS parcels containing a total of $60,000 to Sanchez. All three parcels were believed to be stolen, prompting the DTO to stop mailing drug proceeds, and instead use couriers to deliver bulk currency to Sanchez.

### Defendant – Miguel Sarabia

Sarabia supplied the Perez III DTO with marijuana edibles, marijuana oils/waxes, marijuana vape cartridges, and vape cartridge packaging, which was then sold in Milwaukee, Wisconsin, under the brand name "Midwest Connect" or "Midwest Connected." Sarabia joined the conspiracy in late 2019. According to the California Department of Motor Vehicles, public databases, as well as information from law enforcement officers in California, Sarabia also uses the alias name of Ali Mas.

Sarabia and Perez III were believed to only communicate through the third-party application, WhatsApp, as no communications between Sarabia and Perez III were intercepted over any of the Target Telephones. During the course of this investigation, Sarabia used several cellular telephones, including (949) 534-xxxx (Target Telephone 7), as well as other unknown telephone numbers. In addition, Sarabia used the third-party phone application WhatsApp to further the activities of the DTO. Between May 15, 2020, and September 3, 2020, there were approximately 1,461 communications registered between Perez III and Sarabia, according to the pen and trap for their WhatsApp accounts.

### *Intercepted Communications*

### *Sarabia supplied DTO with marijuana edibles, oils, and vape cartridge packaging*

For example, on May 19, 2020, at 4:17 p.m., Sarabia, using Target Telephone 7, called Sanchez, using Target Telephone 5. During the conversation, Sanchez stated, "Hey, we're about to get shit cracking in Milwaukee. When you wanna jump this shit? 'Cause... Hey, you know what this nigga just told me?" Sarabia replied, "Yeah." Sanchez stated, "He – hey, those indoors were sold in six days. Those 100 pounds were sold in six days of indoors." Sarabia asked, "Yeah?" Sanchez replied, "In six fucking days." Sarabia stated, "Yeah, I believe it." Based upon their training, experience, and familiarity with the investigation, case agents believe that Sanchez referred to Perez III's sale of 100 pounds of indoor-quality marijuana in six days in Milwaukee ("Those 100 pounds were sold in six days of indoors."). Sanchez stated, "He said the only problem is the muscle, like all that but we get all that shit over there we'll fucking—this shit would be crackin'. Imma do three boxes over here. I'm opening another box. So Imma do three boxes and Imma come home pay you out." Sarabia stated, "Hell yeah." As indicated above, case agents are aware that a "box" is used to describe one hundred pounds of marijuana.

Later in the conversation Sanchez stated, "Nah, Ocho's (Perez III) all like thinking you're mad— [chuckles] We'll, I don't know if you don't know if your dad..."

6

Sarabia replied, "No I ain't mad at him." Sanchez replied, "Your dad don't hit me up." Sarabia asked, "Why would I be mad—I mean I usually only text him when I gotta update him whenever I got going to him but I don't got shit going to him, you know, right now." Sanchez replied, "Hey, he said he sent you the [U/I] list too?" Sarabia asked, "Did I send it to him?" Sanchez replied, "No 'cause when I called him on it he said—he acted like—he was like no his bill is 106 racks or something." Sarabia stated, "I don't know I gotta see that text. I don't fucking know. I thought I copied and pasted the whole text and their Halex bill's on there too." Sanchez replied, "Oh, no." Sarabia continued, "But I thought I had sent it to you." Sanchez replied, "Nah, but it's cool you should just said fine—you woulda paid the bill." Sarabia stated, "I thought I [U/I] text. I haven't checked. Honestly, after that he texted. I didn't even look at it. I just— I don't know what he said." Sanchez replied, "Nah, nah he was just like I think your dad's mad at me. He made a comment like "oh, your dad" like "know your dad wants his cheese." Sarabia stated, "Yeah." Sanchez continued, "But yeah [U/I] all that "my dad ain't trippin' bro." I was like, "but I mean who don't want their money."

On May 21, 2020, at 12:25 a.m., Sarabia, using Target Telephone 7, called Sanchez, using Target Telephone 5. This conversation lasted approximately 43 minutes. Sarabia stated, "Yeah, you got like thirty thousand (30,000) blue ones, like seventeen thousand (17,000) Gorillas. Some shit." Sanchez asked, "Oh, is it the-[U/I] come in already? Damn." Sarabia replied, "Yeah, I guess. I mean, the other day I stopped the cart, you only got the boxes." Sanchez replied, "Yeah, no yeah." Sarabia stated, "He ain't get all the carts yet." Sanchez replied, "No yeah, no yeah. Oh it's [U/I]." Sarabia stated, "You gonna have to wait. I know you must be sittin' on boxes [U/I]." Sanchez replied, "No, he just put the- he'll put out the cheese." Sarabia replied, "Yeah. It's all good." Based upon their training, experience, and familiarity with the investigation, case agents believe this discussion pertained to the DHL packages Perez III received that contain the empty vape cartridge boxes and the empty vape cartridges. The investigation revealed that Sarabia coordinated these shipments from Hong Kong for Perez III and Sanchez.

Later in the conversation Sanchez stated, "He said he gonna pay you like—He said he was gonna do these two (2) boxes, three (3) boxes and then he's gonna pay you. But-whenever you wanna pull the trigger, I don't give a fuck. I have a hundred racks right here." Sarabia replied, "No I mean, well. Imma let him be—shit." Sanchez stated, "I don't care. You want a strong arm—a strong arm, I got it." Sarabia replied, "I have a strong arm." Sanchez stated, "I'll be like [Stutters]…" Sarabia stated, "I ain't be trippin" in a little [U/I]." Based upon their training, experience, and familiarity with the investigation, case agents believe that the two discussed Perez III paying the debt to Sarabia. Perez III and Sanchez were going to sell 200-300 pounds of marijuana and then Perez III would repay Sarabia. ("He said he was gonna do these two (2) boxes, three (3) boxes and then he's gonna pay you."). Further, case agents believe that Sanchez had $100,000 in cash, ("I have a hundred racks right

here"), and offered to pay Sarabia the debt that Perez III owed to Sarabia; however, Sarabia wasn't concerned about the debt. ("I ain't be trippin.").

Sanchez continued, "I'm sorry nigga, I'm going home [U/I] that nigga is like, 'Hey bro, it's like you said more money [U/I] your own.'" Sarabia replied, "I'm gon' [U/I] I don't wanna feel like I have to fucking strategy trynna [U/I]." Sanchez replied, "Yeah. I feel ya. Yeah." Sarabia asked, "You know?" Sanchez replied, "Oh, he be like "oh your dad is a plug. He does real [U/I], he be saying." Based upon their training, experience, and familiarity with the investigation, case agents believe that Perez III told Sanchez that Sarabia was a good source of supply ("oh your dad is a plug. He does real [U/I], he be saying."). Sarabia replied, "Nah, I got him. [U/I] shit. Everybody fucks with me when they trynna get down. Not because of money 'cause I'm a man of principle."

Sarabia later returned to the subject of Perez III, "Yeah, and Milwaukee, Milwaukee, I'm getting sick of waiting on Milwaukee. I bet he's just waiting there." Sanchez replied, "If it is, it is [U/I]. If not, we'll figured something." Case agents believe that Sarabia thought Perez III was holding a large amount of U.S. currency in Milwaukee and Sarabia was getting frustrated. ("I'm getting sick of waiting on Milwaukee. I bet he's just waiting there."). Sarabia stated, "I been to that lady, you know Rosa [U/I]." Sanchez replied, "All I know is either way if we could..." Sarabia interrupted, "I told her, 'you need to talk to your guy 'cause you know what I'm gonna end up fucking up this money, spending' that's what I told her." Case agents believe Sarabia had additional contacts in the Milwaukee area. Case agents further believe that Sarabia and Sanchez were attempting to further their controlled substance distribution network. Case agents believe "Rosa" was at least one unknown associate in the Milwaukee area. Sanchez replied, "Yeah, I was gon' say if that don't work out we gotta get something inside 'cause that shit is gonna be a goldmine for us. 'Cause I got - - Everyone right now needs it 'cause..." Sarabia affirmed, "Yeah." Sanchez stated, "That's all that's in demand right now." Sarabia continued, "I told her the only reason I'm gonna do this shit [U/I] I know what I'm doing." Sanchez stated, "Yeah, that's all that's in demand right now. That shit is so high in demand."

On May 30, 2020, at 6:09 p.m., Sarabia, using Target Telephone 7, called Sanchez, using Target Telephone 5. During the conversation Sanchez stated, "Yeah. Still doing. Still going. He's still sending another 100K. [U/I] another fuck." Sarabia's response was unintelligible. Sanchez stated, "I was running it up real quick. [U/I] kicked ass." Sarabia replied, "Yeah." Sanchez stated, "Fucking. I wanna do that..." Based upon their training, experience, and familiarity with the investigation, case agents believe that Sanchez expected $100,000 in the mail from Perez III to purchase more marijuana. ("He's still sending another 100 K."). Along these same lines Sarabia stated, "I texted Ocho last time he said he got his packages. All the other ones, I mean the new shit. I mean its still. All his other stuff is from Hong Kong. The other shit. It's already been shipped but I guess, uh, it's in Hong Kong right now so I don't know when they are gonna they're gonna [U/I] from that." Case agents believe

8

Sarabia confirmed with Perez III that Perez III recently received some of the international packages from Hong Kong, China, containing the empty vape cartridges and empty vape packages. A check by case agents with U.S. Customs and Border Patrol, revealed that Perez III received packages containing empty vape cartridges from Hong Kong within the time frame of this intercepted call.

On June 30, 2020, at 8:35 p.m., an unidentified male (UM5114), using (480) 375-xxxx, called Sarabia at Target Telephone 7. During the call, Sarabia stated, "Okay, this is what I'm going to need from you Pizarron. It's a little complicated. 'Cause I'm getting ready to head back to Wiscon-- so Imma-- and then—." Case agents believe that the reference to "Wiscon" was meant to be Wisconsin. UM5114 replied, "Okay." Sarabia stated, "I got your paper. Imma put your paper. So Imma need from you to get me access to your debit card, the BMA the one for the business but I need the card. What I need to do is I need to put it on Applepay 'cause Imma deposit the money from the ATM then, but it takes like two days. I'll put like [AUDIO BREAKS] . . . So what Imma do, Imma put the money in your account." UM5114 replied, "How much you put it though?" Sarabia stated, "I'ma fucking-- the whole thing, what I'm gonna do. Probably get you about 20-30 g's right away boom off the back to get you moving. Somewhere around there, you know? Just to get." Case agents believe that Sarabia was going to place U.S. currency, possibly owed for previous drug transactions, onto the Apple pay card for UM5114. UM5114 replied, "So what I gotta do? I gotta send you my card?" Sarabia answered, "The card. I need you to give me. Imma-- I don't need it right now. When I'm there, I'm gonna ask you then. Imma enter my apple thing and then what I do. I go to the ATM, I put my phone on the little thing, bluuuuuh, it makes a noise and then I enter your pin and I just deposit the fucking paper. And it says deposit 25 bills at a time, you know? So Imma try to put it [U/I] time." Based upon their training, experience, and familiarity with the investigation, case agents believe this is in reference to the fact that the ATM only permitted 25 bills per ATM deposit transaction placed onto UM5114's Applepay card, which case agents know to be a contactless payment technology for Apple devices that allows you to pay using your Apple device instead of a debit or credit card. Because of the ATM deposit limit, case agents know from the investigation and surveillance that Sarabia conducts numerous ATM deposits at a time to deposit the drug proceeds. UM5114 replied, "Yeah."

In the continued conversation between Sarabia and UM5114, Sarabia states that he purchased a building in Dane County, Wisconsin, and that he was in the process of opening a "distribution center," which would allow him to manufacture, distribute, and broker marijuana and marijuana-related substances to dispensaries.

Later in the conversation, UM5114 stated, "Do they have a Chase over there in Wisconsin?" Sarabia replied, "Uh, I gotta check. I know they have BMA's that I do know, you know? No not Wisconsin, in Chi." UM5114 asked, "Oh, in Chi?" Sarabia replied, "Mm-hmm. Well the money still in Chi. It's not in Wiscon." UM5114 stated, "Oh, alright." Sarabia continued, "Yeah, I got the money in Chi, in Wisconsin when

9

I move it up, but I have the money sitting over there. I moved it over there because when [AUIO BREAKS] BMA so I said, "Imma move the money over here" and it's about a two hour drive. I don't wanna -- I was not 'bout to drive with a million, uh, 1.6, I can sure that shit was stressing." Based upon their training, experience, and familiarity with the investigation, case agents believe that Sarabia had secreted 1.6 million dollars in U.S. currency somewhere at a stash location in Illinois. UM5114 exclaimed, "What the fuck!" Sarabia replied, "I was stressing the fuck out. I went and took it. I took it because my friend told me he was going to send it to me over here. A Chinese/Asian guy, you know? So I arrived and went to go get the Chinese/Asian to that place. You know how I do it. When I [U/I] receipt in Nola." Case agents believe that the unknown Chinese or Asian person paid Sarabia a large portion of the U.S. currency and Sarabia was worried about transporting such a large quantity of U.S. currency that represented illegal proceeds. Therefore, Sarabia left the money at a safe location in Illinois.

On July 5, 2020, at 8:33 p.m., Sarabia, using Target Telephone 7, received a call from unidentified male (UM0000), using the phone number (562) 247-xxxx. During this conversation, Sarabia and UM0000 discussed selling marijuana edibles, and UM000 told Sarabia that he had a "lot of boys" in "Wisconsin, Milwaukee, Chicago." UM0000 continued, "Well the other one, the thing is, it's not really that it's good, it's no one can fuck with us. Not even half." UM0000 asked, "Know what I mean? Put it this way, everything we put-we're gonna put like four (4), five (5) dollars on top of everything." Sarabia replied, "Yeah like-like the eddies." The eddies is big money, you know? . . . I'll tell you one thing. If I ain't doubling, I ain't touching it. How 'bout that?" It's the only way Imma risk my paper." Case agents believe UM0000 and Sarabia discussed the hefty profit they are able to make on marijuana edible products. ("The eddies is big money, you know?"). Furthermore, case agents believe Sarabia told UM0000 that Sarabia would double the price of marijuana edibles to make a better profit ("If I ain't doubling, I ain't touching it"), and that Sarabia didn't want to risk his money for anything less ("It's the only way Imma risk my paper.").

As the conversation continued Sarabia said, "I'm a player though. I'm a player. I don't give a fuck. I lost [unintelligible amount of money] G's. Don't give a fuck, that shit don't stop me." UM0000 replied, "Yeah, I'll get it there." Based upon their training, experience, and familiarity with the investigation, case agents believe Sarabia told UM0000 that Sarabia was motivated to sell and make money by selling controlled substances. UM0000 told Sarabia that he will get the controlled substances to Sarabia in Wisconsin ("Yeah, I'll get it there"). Sarabia continued, "I fucked up, I fucking [U/I] and that's what, even my boy told me, 'You should never ever vacuum; I'm like you, 'You told me dick.' He goes, 'Yeah, but I didn't think you were gonna go like that. I thought you was gonna use those little boxes.' I fucking vacuumed that, I fucking sent it was six or seven boxes, fifty (50) pounds each. It was uh, six vacuums, vacuum seals – little things in each one." Case agents further believe Sarabia explained to UM0000 that Sarabia had six or seven boxes with 50 pounds of marijuana in each confiscated by law enforcement. Sarabia explained to UM0000

10

that his "boy" (Sanchez) told Sarabia that Sarabia shouldn't vacuum seal marijuana with other controlled substances. Sarabia and UM0000 then discussed how "they" (law enforcement) know what packaged marijuana distributed through parcel shipments appears to look like based on how the boxes are packaged, and the density.

According to U.S. Postal records, on July 9, 2020, Perez III shipped three postal packages to Sanchez in California to the address 32xx E. Valley View Avenue, West Covina, California. As described above, the packages were not delivered despite being marked delivered by the United States Postal Service. In this aftermath, Sarabia talked over Target Telephone 7 to numerous individuals, over the course of several days, about these packages, including Jesus, as well as unidentified individuals. In these calls, Sarabia discussed Sanchez's failure to adequately respond to the situation and indicated that Perez III would give him "10 racks -- from the 60 G's." if he could recover the money. Further, Sarabia told Jesus that Perez III told Sarabia he (Perez III) was getting a crew ready to go to California, and Sarabia told Jesus that he believed the "the crew is us."

### _Sarabia met with Perez III in Wisconsin to Obtain Drug Proceeds_

Sarabia traveled to Milwaukee on at least three occasions to obtain drug proceeds. These trips occurred in June, July, and August 2020. After obtaining drug proceeds from Perez III, Sarabia then made cash deposits into ATMs at a Citibank in Vernon Hills, Illinois.

For example, based upon the court ordered Title III wiretap location data associated with Target Telephone 7, case agents confirmed Sarabia traveled to Wisconsin, on July 14, 2020, and that he was operating a silver 2016 Toyota Camry bearing Illinois registration AE2 xxxx, which case agents located on July 15, 2020. Case agents conducted physical surveillance of Sarabia and determined Sarabia and his known girlfriend, M.C., were staying in an apartment located at 7xx W. Wisconsin Avenue in the City of Milwaukee, Wisconsin.

On July 16, 2020, at approximately 11:43 p.m., the court ordered location data associated with Sarabia's Target Telephone 7 reflected that Sarabia was in the area of Perez III's residence. Case agents responded to the area, and at 12:15 a.m. on July 17, 2020, located Sarabia's silver 2016 Toyota Camry parked on the west side of S. 57th Street several houses north of 16xx S. 57th Street, Perez III's residence. At approximately 2:28 a.m., case agents observed the silver Toyota Camry leave its parked location with the lights off. Case agents were unable to observe who entered the vehicle due to the time of day.

At approximately 2:38 a.m., case agents observed the silver Toyota Camry enter the parking lot behind 7xx W. Wisconsin Avenue and park. Case agents observed the trunk open on the Toyota Camry and observed Sarabia exit the front driver's door and M.C. exit the front passenger door. Case agents observed Sarabia

11

walk to the trunk of the car and retrieve a large darker colored backpack from the trunk that appeared to be weighted down. Both Sarabia and M.C. walked to the entrance of 7xx W. Wisconsin Avenue and entered the building. Based upon their training, experience, and familiarity with this investigation, case agents believe that Sarabia met with Perez III to obtain proceeds from drug trafficking.

On July 17, 2020, at 6:14 p.m., Sarabia, using Target Telephone 7, called UM5114. During the conversation Sarabia stated that he was at "Vernon Hills." Sarabia stated, "But I went in there, and I was waiting, I was like, "Why isn't [U/I] right there? 'Cause the ATM, I was in the line, and nobody [U/I]. It said right there, "No Cash." So I said, squish, I'm out... two minutes ago." UM5114 replied, "Shit, so that one's not even taking cash?" Sarabia stated, "No, that one doesn't have cash. I mean so, I'm gonna – there's another one but it's – it's like towards the city. [U/I] I got like 90 G's on me. Some twenties (20), [U/I] like fuck. I've been depositing. Don't think I just deposit for you. I've been fucking racking, bro." Case agents believe Sarabia collected and deposited drug proceeds for UM5114 to assist UM5114 with laundering his money. UM5114 asked, "For someone else, or what?" Sarabia stated, "Yeah, some stuff have came up. I've been racking it up. But all the hundreds, the the- the- all the big bills I sent them all. Because those bigger ones they're expecting the [U/I] to grab."

Later on in the conversation Sarabia stated, "It's all good. It's your best friend. He texted me." UM5114 replied, "I never knew that." Sarabia responded, "C'mon man, you don't need nothing from anybody. I'll send it, don't worry." UM5114 asked, "Huh?" Sarabia stated, "I gotta tell him, give me three or four accounts." Case agents believe that Sarabia referred to different bank accounts when Sarabia referenced "accounts." Sarabia continued, "Different ones, and I'll put it over there, and that's it. And you don't got to worry about shit." UM5114 replied, "Well, yeah, if you do it that with the card." Sarabia replied, "You don't need the card in order to -- with his account bro. I got all of the papers for all that." UM5114 stated, "I know. I know the way you were talking about it. I knew you were talking about those." Sarabia stated, "No, [U/I] I got like 15 fucking accounts bro. I went to the wrong [U/I] number, oh fuck. [U/I] go back to the message, fucking . . . Right now I'm heading to the other one." Case agents believe that Sarabia had access to 15 different bank accounts that Sarabia used to deposit drug proceeds and further believe the accounts are not with the same bank. UM5114 asked, "How much you trynna do?" Sarabia answered, "Well fuck, I'm trynna bring your thirty (30), nigga." Based upon their training, experience, and familiarity with the investigation, case agents believe Sarabia attempted to deposit thirty thousand dollars for UM5114. UM5114 responded, "Alright." Sarabia stated, "That's what I'm trynna do." UM5114 exclaimed, "You halfway! You halfway!" Sarabia replied, "No well, I put fourteen (14). When I tried to put, it didn't let me put more. It spit it out. . . . It spit it out so I'm like, it's gassed out. Put it back in and nothing." Case agents believe Sarabia deposited fourteen thousand dollars into one ATM; however, the machine would not allow Sarabia to deposit anymore.

12

On July 17, 2020, at 1:11 p.m., case agents conducted physical surveillance of Sarabia and M.C. Case agents observed Sarabia and M.C. leave Milwaukee, Wisconsin, together in the Toyota Camry described above. Case agents observed Sarabia walk to the vehicle carrying a weighted down backpack, which appeared to be the same backpack Sarabia carried when he returned from Perez III's residence earlier that morning. Case agents followed Sarabia and M.C. from Milwaukee, Wisconsin, to Illinois, and conducted surveillance throughout the afternoon. Case agents observed Sarabia and M.C. eventually stop at a Citi Bank located at 7xx N. Milwaukee Avenue, Vernon Hills, Illinois. Case agents observed Sarabia arrive at the Citi Bank at approximately 4:58 p.m. and pull into the drive through and stop at the ATM machine. Case agents observed Sarabia maneuvering the machine, and it appeared that he placed something into the ATM, after which he received several receipts. Case agents believe Sarabia conducted several transactions while he was at the ATM. Case agents observed that Sarabia left the ATM at approximately 5:12 p.m. Based upon the timing in conjunction with the surveillance, case agents believe the conversation between Sarabia and UM5114, detailed above, corresponded to these transactions.

On July 21, 2020, at 5:25 p.m., Sarabia, using Target Telephone 7, called Jesus, using (562) 284-xxxx. During this call, Jesus stated, "And that clown, did he report himself?" Sarabia responded, "Well, I will see, tomorrow. I will see him tomorrow night so he can give me what's left. Thirty is what is left. Thirty-two. I will see him tomorrow. So hopefully he is ready, so we are good with that." Jesus commented, "Yeah, get that out the way." Sarabia stated, "Yeah, once I get that, I'm good." Based upon their training, experience, and familiarity with the investigation, case agents believe that Jesus and Sarabia discussed the remaining money owed to Sarabia from Perez III and that the amount was $32,000. Further, case agents believe that Sarabia was going to see Perez III "tomorrow" to collect the outstanding balance.

On July 22, 2020, at 12:27 p.m., Sarabia, using Target Telephone 7, called Jesus, using (562) 284-xxxx. During this call, Jesus stated "And that man, did he report himself?" Case agents believe that this is in reference to Perez III. Sarabia answered, "I'm going see him at eight (8:00)." Jesus stated, "Alright. Well let's see what happens." Sarabia replied, "Yeah, I'm gonna see him today and then I'll be on my way, tomorrow." Jesus responded, "Yeah, well let's see if he comes through." Case agents believe this to be in reference to Perez III paying Sarabia the outstanding balance owed to Sarabia. Sarabia stated, "Yeah, I texted him earlier. Like, "hey, you know, hopefully we can do it earlier and not too late." 'Cause last time, Dick, he had me [U/I] like 3:00, I left at 3:00 in the morning." Case agents believe that this is in reference to the payment that Perez III made to Sarabia on July 17, 2020, referenced above. Jesus responded, "No, fuck all that." Sarabia replied, "I told him-I told him – that's messed up. I told him yesterday, you know, could you make it earlier. You gotta give me time to do what I gotta do, you know?" Case agents believe that Sarabia talked about needing the money earlier because he had to deposit it. Jesus stated,

13

"Yeah. Did he answer?" Sarabia replied, "Yeah, he told me at 7:00. I told him if we can do 8:00. I told him "that's fine." Case agents believe that Perez III and Sarabia made arrangements to meet later that evening to make the payment.

In response to the above-referenced call, case agents conducted surveillance in the area of 7xx W. Wisconsin Avenue. At approximately 8:20 p.m., case agents observed Sarabia and M.C. exit 7xx W. Wisconsin Avenue and enter the silver Toyota Camry bearing Illinois registration AE2-xxxx. Case agents had established surveillance at Perez III's residence at 16xx S. 57th Street, and at 8:36 p.m., case agents observed Sarabia exit the Camry carrying a backpack. At 8:49 p.m., Perez III arrived in a Chevrolet Impala and greeted Sarabia. Case agents observed both Sarabia and Perez III on the porch at 16xx S. 57th Street where they then disappeared from case agents' view. At 9:37 p.m., case agents observed Sarabia exit the residence at 16xx S. 57th Street and walk to the trunk of the vehicle where Sarabia was observed placing the same backpack into the trunk of the Camry. Case agents followed Sarabia and M.C. back to 7xx W. Wisconsin Avenue where they parked in the parking lot. Sarabia exited the passenger seat and removed the same backpack from the trunk of the Camry before entering the building. Based upon their training, experience, and knowledge of this investigation, case agents believe that Sarabia obtained drug proceeds from Perez III, which he transported in the backpack.

On July 23, 2020, at 1:01 p.m., Sarabia, using Target Telephone 7, called Jesus, using (562) 284-7435. This conversation occurred partly in Spanish and partly in English. During this call, Sarabia told Jesus that "I seen him yesterday" and that Sarabia got his "bread." Case agents believe that Sarabia confirmed he met with Perez III to collect his owed proceeds from drug trafficking.

As another example, on August 18, 2020, at 7:39 p.m., the location data showed that Sarabia was in the downtown Milwaukee, Wisconsin area. At 9:03 p.m., the location data showed that Sarabia was in the vicinity of 16xx S. 57th Street, West Allis, Wisconsin. (Perez III's residence). Case agents attempted to conduct physical surveillance, but by the time agents arrived Sarabia was no longer in the area. Case agents reviewed the WhatsApp pen data and observed that Perez III and Sarabia were in contact via WhatsApp several times from approximately 5:25 p.m. until approximately 8:56 p.m.

Case agents reviewed the surveillance camera at the rear of 16xx S. 57th Street (Perez III's residence) and observed that at approximately 8:54 p.m., a small SUV vehicle arrived and parked in the alley near Perez III's residence. A single subject exited the driver's door and went to the rear of the vehicle and removed a bag. Due to darkness, case agents could not positively identify the person. After retrieving the bag, the subject walked toward the alley gate at 16xx S. 57th Street. At approximately 9:15 p.m., the subject walked out of the area of 16xx S. 57th Street, entered the small SUV, and drove out of the camera view. Based on the investigation to date, as well

14

as the location data for Sarabia's phone, case agents believed that this subject was Sarabia.

Case agents reviewed the location data for Sarabia's phone, which revealed that Sarabia returned to the area of downtown Milwaukee briefly, then traveled south on I-94 to Vernon Hills, Illinois, and arrived at 10:53 p.m. Sarabia then traveled back to downtown Milwaukee, where he arrived at approximately 1:58 a.m. on August 19, 2020. Case agents believe that Sarabia obtained proceeds from drug trafficking from Perez III and subsequently travelled with the proceeds to Vernon Hills, Illinois, where the proceeds were deposited via ATM into unknown bank accounts.

### *Sarabia Concealed Drug Proceeds*

Sarabia owned a Boost Mobile store, a Direct TV store/Dish TV, and other unidentified businesses. Additionally, Sarabia had multiple bank accounts and numerous LLCs, some of which were linked to either his long-time girlfriend, M.C., and/or his alias, Ali Mas.

Based upon USPS records, intercepted calls, physical surveillance, and bank records, Sarabia used his various bank accounts and LLCs to launder DTO proceeds. Specifically, Sarabia knew about the concealed U.S. currency shipped from Milwaukee, Wisconsin, to various addresses in California, and he deposited large amounts of cash, which he then used for business purchases.

For example, on March 9, 2020, a cash deposit of $39,000 occurred in Sarabia's Citibank business account ending in x401, which he opened in the name of Ali Mas/ATF Qwiky Trust. On the same day, a wire transfer was initiated from this Citibank business account (x401) for $38,850 to a business in China.

As another example, on April 22, 2020, a cash deposit of $31,500 occurred in Sarabia's business x401 account. On the same day, a wire transfer was initiated for $30,000 to the same business in China.

### *Premises Searches*

On September 22, 2020, Sarabia's residence and businesses were searched pursuant to federal search warrants. In his residence, law enforcement located $80,100 in United States currency. The business space that was for his "Direct TV/Dish TV" Store spanned the physical space of 4 interconnected rental units. Within the "Direct TV/Dish TV" space, Sarabia operated a large-scale THC oil and THC edible lab in one unit. Located in the lab were approximately 178 kilograms or 383 pounds of already infused THC edibles and vape cartridges, and approximately 4.5 kilograms of liquid TCH oil. Also located in a room that opens to Sarabia's office (which contained computer equipment, financial documents, and approximately 23 cell phones) and that is adjacent to the marijuana edible lab, authorities located a Sig

15

Sauer semi-automatic pistol, bearing serial number EAU022301, on the ceiling above the doorway leading to a small sink/storage room. Also located above this doorway was electronic equipment. Some of the seized cell phones were associated with DirectTV dealers. However, a random search of two of the dealer-associated phones contained screen shots of pictures reflecting shipping company records of packages containing marijuana products being sent to target addresses in Milwaukee.

Also on September 22, 2020, a Milwaukee DTO stash location, 12xxx S. 25th Street, was also searched. Located at this residence was approximately 2,650 filled THC vape cartridges, totaling approximately 4.6 kilograms of THC oil; approximately 800 empty vape cartridges; approximately 81.85 grams of cocaine; approximately 3,000 grams, or 5.2 kilograms, of THC wax; approximately 1,200 grams of flower THC; thousands of THC edibles, totaling approximately 111.1 kilograms; approximately 13 cell phones; a digital scale; and 1 loaded firearm, a FN Herstal, model FNP-45, 45 caliber pistol.

From two other DTO residences, law enforcement authorities seized approximately 333 kilograms of marijuana edibles and 9.9 kilograms of filled vape cartridges (Chong Yang's residence); and approximately 37 kilograms of filled vape cartridges and 33.5 kilograms of marijuana oils (Mary Yang's residence).

### *Sources of Information*

SOI #5 related that SOI #5 provided Sarabia's phone number to Perez III so Sarabia could supply materials needed for the DTO's marijuana vape cartridge manufacturing. According to SOI #5, Sarabia had a "plug" in Hong Kong that would supply the materials and packaging needed for the marijuana vape cartridges. SOI #5 related that in 2020 Sarabia was the exclusive supplier of all of the marijuana edibles, marijuana oils, marijuana crumble, and marijuana shatter, as Sarabia cut out other suppliers by undercutting the cost to Perez III. Further SOI #5 stated that Sarabia manufactured the marijuana edibles for Perez III at a marijuana edible manufacturing lab, and that Sarabia manufactured fake labels for the DTO's edibles.

SOI #5 stated that Sarabia fronted all marijuana products to Perez III, and Perez III was in debt to Sarabia by over $100,000. SOI #5 further related that Sarabia and Perez III only communicated with each other via the WhatsApp phone application as well as an application that Sarabia developed. SOI #5 knew Sarabia met with Perez III in person in Milwaukee for payment, and that he went to Chicago to move large amounts of U.S. currency for the Mexican drug cartels. According to SOI #5, Sarabia co-owned the Boost Mobile business, and that while Sarabia did sell some phones, he used it as a "front" to launder money.

Furthermore, SOI #5 indicated that before manufacturing marijuana edibles in the lab, Sarabia grew marijuana in the building. SOI #5 stated that Sarabia said that he purchased a warehouse in Wisconsin, where he planned to operate a legal

16

marijuana grow. According to SOI #5, Sarabia used numerous names and had numerous fake ID's with various names on them.

Finally, SOI #5 related that Sarabia used to keep guns on the roof, up in the ceiling of the warehouse, or concealed in the vending machines of the warehouse on Paramount Boulevard.

SOI #7 related that Sarabia was Perez III's source of supply for the marijuana edibles, and that Sarabia and Perez III started doing drug business together in 2020.

Based upon the evidence, Miguel Sarabia is responsible for the distribution of at least 700 kilograms but less than 1,000 kilograms of a mixture and substance containing marijuana.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

## PENALTIES

7.      The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum terms of imprisonment and fine: 40 years and $5,000,000 fine. The offense also carries a mandatory minimum of 5 years of imprisonment, and at least 5 years and a maximum life term of supervised release. The offense also carries a mandatory special assessment of $100.

8.      The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## PROOF OF DRUG WEIGHT FOR STATUTORY MAXIMUM PENALTY

9.      The parties understand and agree that for the penalties in 21 U.S.C. §841(b)(1)(B) to apply, as provided in paragraph 7 above, the government must

17

prove beyond a reasonable doubt that the offense to which the defendant is pleading guilty involved at least 100 kilograms of marijuana. The defendant agrees that the government possesses sufficient, admissible evidence to meet this burden.

## DISMISSAL OF INDICTMENT

10.     The government agrees to move to dismiss the Indictment as to Miguel Sarabia at the time of sentencing.

## ELEMENTS

11.     The parties understand and agree that in order to sustain the charge of conspiracy to possess with the intent to distribute or to distribute a controlled substance as set forth in the Information, in violation of 21 U.S.C. §§ 841(a)(1) and 846, the government must prove each of the following propositions beyond a reasonable doubt:

> First, the conspiracy, as alleged in the information, existed; and
>
> Second, the defendant knowingly and intentionally joined the conspiracy with the intention to further the conspiracy.

## SENTENCING PROVISIONS

12.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

13.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the

court will give due regard to the Sentencing Guidelines when sentencing the defendant.

14.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense set forth in paragraph 5. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

15.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

### Sentencing Guidelines Calculations

16.     The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

19

## Relevant Conduct

17.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

18.     The parties agree to recommend to the sentencing court that the relevant conduct attributable to the defendant is at least 700 kilograms but less than 1,000 kilograms of a mixture and substance containing marijuana, a Schedule I controlled substance.

## Base Offense Level

19.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offenses charged in the Information is 28 under Sentencing Guidelines Manual § 2D1.1(c)(6).

## Special Offense Characteristics

20.     The parties agree to recommend to the sentencing court that a 2-level increase for maintaining a premises for the purpose of manufacturing or distributing a controlled substance under Sentencing Guidelines Manual § 2D1.1(b)(12) is applicable to the offense level for the offense charged in the Information.

## Weapons

21.     The government agrees to recommend to the sentencing court that a 2-level increase under Sentencing Guidelines Manual § 2D1.1(b)(1) is applicable to

20

the offense level for the offense charged in the Information because a firearm was possessed.

## Acceptance of Responsibility

22.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

23.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offenses as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

24.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

25.     The government agrees to recommend a sentence within the applicable sentencing guideline range, as determined by the Court.

## Court's Determinations at Sentencing

26.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

27.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

28.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to

22

participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

29. The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form.

## Special Assessment

30. The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

## Forfeiture

31. The defendant agrees that property item described below and listed in the Indictment filed in this case constitute proceeds of the offense to which he is pleading guilty, or were used to facilitate that offense, or both. The defendant warrants and represents that he is the sole owner of the below-listed property item. The defendant agrees that the property item listed below shall be forfeited to the United States, and the defendant agrees to the immediate entry of a preliminary order of forfeiture against this property item in this criminal case.

      a. Approximately $80,100 in United States currency seized from 11xxx Baylor Drive, Norwalk, California, on or about September 22, 2020.

32. The defendant agrees to take all steps as requested by the United States, including executing documents needed to pass clear title to forfeitable assets

23

to the United States and to facilitate the sale of such forfeitable assets. If any third party makes a claim as to any of these items, the defendant agrees to provide truthful testimony, if called up to do so, regarding his sole ownership of the item and regarding the validity of any claim of ownership by a third party.

33.     The defendant waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. The defendant acknowledges that the forfeiture of assets is part of the sentence that the sentencing court may impose in this case and the defendant waives any failure by the sentencing court to advise him of this, under Rule 11(b)(1), at the time his guilty plea is accepted or at sentencing.

34.     The defendant further agrees to waive all constitutional and statutory challenges in any manner (including by direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this plea agreement, including any argument that the forfeiture constitutes an excessive fine or punishment.

## DEFENDANT'S WAIVER OF RIGHTS

35.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

    a.    If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury,

the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

36. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offenses to which the defendant intends to

25

plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

37.    The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

38.    The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

<u>Further Civil or Administrative Action</u>

39.    The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

26

## GENERAL MATTERS

40.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

41.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

42.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

43.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offenses on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

44.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the

27

defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing.

**VOLUNTARINESS OF DEFENDANT'S PLEA**

45.    The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

# ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: _12 · 28  2021_        _____

                                      MIGUEL SARABIA
                                        Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: _12-28-21_        _____

                                        MATTHEW J. LOMBARD
                                        Attorney for Defendant

For the United States of America:

Date: _12/28/2021_        _____

                                        RICHARD G. FROHLING
                                        United States Attorney

Date: _12/28/2021_        _____

                                        ELIZABETH M. MONFILS
                                        GAIL J. HOFFMAN
                                        Assistant United States Attorneys